## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**NEIL HUNTER** and **JORDEN JUDGE**, individuals,

    Plaintiffs,

v.

**CITY OF WYANDOTTE**, a municipality, **BRIAN ZALEWSKI**, in his individual capacity, and **ARCHIE HAMILTON**, in his individual and official capacities,

    Defendants.

**Case No**. **2:26-cv-11227**
**Hon**.
**Mag**.

**DEMAND FOR JURY TRIAL**

_____

Nakisha N. Chaney (P65066)
**Salvatore Prescott Porter & Porter PLLC**
Attorneys for Plaintiffs
105 E. Main Street
Northville, MI 48167
248.679.8711
chaney@sppplaw.com

_____/

## COMPLAINT AND JURY DEMAND

There is no pending civil action arising out of the same transactions or occurrences alleged in this complaint.

## Preliminary Statement

1.  Certain Wyandotte Police Department officers abuse the public.

2.  Plaintiffs, who are decorated career police officers and former Officers of the Year, spoke out about the abuse and paid the price with their careers.

3.  Plaintiffs Neil Hunter and Jorden Judge now bring this action for First Amendment retaliation and, as to Judge, breach of contract and negligence.

## Parties, Jurisdiction and Venue

4.  Plaintiffs are U. S. citizens who reside in the Eastern District of Michigan.

5.  Defendants violated Plaintiffs' First Amendment rights, including the right of speech.

6.  Defendant Brian Zalewski is the former Chief of Police for the Wyandotte Police Department and, upon information and belief, is a resident of the Eastern District of Michigan.

7.  Zalewski is sued in his individual capacity.

8.  Defendant Archie Hamilton is the Wyandotte Police Department's current Chief of Police and is a resident of the Eastern District of Michigan.

9.  Hamilton is sued in his individual and official capacities.

10. Defendant City of Wyandotte is a municipality located in the Eastern District of Michigan.

11. All Defendants are "persons" within the meaning of 42 U.S.C. § 1983, who,

2

while acting under color of law, deprived, or caused Plaintiffs to be deprived, of rights secured by the Constitution and laws.

12. This Court has jurisdiction over Plaintiffs' First Amendment retaliation claim under 42 U.S.C. § 1983, 28 U.S.C. § 1343, and 28 U.S.C. § 1331.

13. This Court has supplemental jurisdiction over Judge's state law claims under 28 U.S.C. § 1367, as they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

14. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Eastern District of Michigan as the events giving rise to this action occurred in Wyandotte, Wayne County, Michigan.

## Material Allegations

15. Plaintiffs were decorated career police officers.

16. Former Lieutenant Neil Hunter was a 25-year veteran of the Wyandotte Police Department. He was twice-honored as the Officer of the Year, most recently in 2021. He is also the recipient of Lifesaving Awards and multiple commendations.

17. Then-Deputy Chief Archie Hamilton described Hunter as "an indispensable asset for our agency," and regarded Hunter's Officer of the Year honor as "well deserved."

18. Just a year prior, in 2020, Hunter was heralded in the media for de-escalating a situation in which a man was screaming and threatening to shoot up the police station. Hamilton praised Hunter, and another officer, for doing "an amazing job in de-escalating the situation without the use of force," noting they were able to recognize that the man was experiencing an emotional crisis and managed to resolve the situation without long-term consequences, such as incarceration or injury.

19. Judge was a police officer for approximately nine years. Hired by Wyandotte in 2018, Judge served six of those years as a Wyandotte police officer before her unlawful termination.

20. During her tenure with Wyandotte, Judge was awarded several commendations, the Lifesaving Award, and, in 2019, she was honored as the Officer of the Year.

21. In nominating Judge for Officer of the Year, Defendant Hamilton described Judge as "one of the preeminent leaders in the department," exhibiting "strong values, integrity and professionalism," and possessing "a relentless work ethic, positive attitude and strong commitment to excellence."

22. During her tenure with Wyandotte, Judge received two Medals of Valor, including a 2024 Medal bestowed upon her by the Michigan Association of Police Chiefs.

23. Judge was slated to be recognized as the Officer of the Year a second time in 2024. However, she was unlawfully fired before the honor was bestowed.

24. Judge had no disciplinary record prior to her termination.

**Plaintiffs Express Concerns About Abusive Police Practices**

25. To Plaintiffs' observation, the culture of policing in the department changed in or around 2022, under Hamilton, who first served as the Deputy Chief under Brian Zalewski, then as Chief of Police beginning in 2024.

26. Plaintiffs had concerns about certain Wyandotte officers engaging in abusive and unlawful police practices, including excessive force, stopping and searching people without legal cause, unnecessarily escalating police stops, and lying in police reports.

27. Hunter and Judge, who are friends, had concerns that extended beyond employment matters. They spoke to each other, while on and off duty, about their concerns for their family and concern for the public in the face of increasingly abusive policing in Wyandotte.

28. Hunter also had conversations with others, outside the scope of his official duties, regarding his concerns. This includes conversations regarding investigations and incidents in which Hunter had no official role or for which any official role he would have had already ended.

29. Zalewski and Hamilton were protective of the involved officers and wanted

Hunter to stop talking about the abusive behaviors.

30. But Hunter remained concerned. And for good reason.

31. In 2023, a Wyandotte police officer approached an unarmed detainee inside the Wyandotte booking area. The detainee was initially standing with his hands behind his back. Facing no physical threat of harm, the officer pushed the detainee backwards and punched the man an approximate half-dozen times in the face and head.

32. Hunter and Judge saw the footage of the assault. Hunter also learned that the officer involved lied on the police report about what happened.

33. Hunter and Judge talked with each other about what occurred.

34. Hunter also talked about it to other officers.

35. After seeing no change in the department's direction, Judge determined that, to protect the public, she had to speak up about this incident and others she learned of.

36. In early 2024, Judge contacted WXYZ Channel 7, suggesting that it seek information through the Freedom of Information Act (FOIA) about several incidents. These incidents regarded the assault at the jail; an incident in which a person died after an alleged unauthorized police chase allegedly initiated by the same officer involved in the jail assault; and an encounter in which the same officer, while escorting an argumentative man who is handcuffed behind his back,

bent the man over and propelled the man headfirst into a cinder block wall, causing a bleeding gash to the man's head.

37. Judge also contacted the Michigan Attorney General's office to report what she believed was illegal police conduct, reporting details of the concerning events and leadership's response.

**Defendants Investigate Plaintiffs**

38. Upon information and belief, then-Chief Zalewski and then-Deputy Chief Hamilton learned that someone contacted the media when they were contacted by a reporter. However, they did not know who made the media contact.

39. Hamilton believed that Hunter contacted the media, as Hunter openly opposed what had become a pattern of unconstitutional and abusive policing.

40. On or around February 22, 2024, Hamilton angrily confronted Hunter. He repeatedly told Hunter that he knew that Hunter spoke to the media. He accused Hunter of lying when Hunter denied it, and he told Hunter that he would prove Hunter was lying through his sources at the news station.

41. On or around February 27, 2024, then-Chief Zalewski notified staff that Channel 7 made a FOIA request, and there would be an investigation to identify the source. There was no question that whoever did it was going to be punished.

42. Judge was interviewed. Zalewski and Hamilton attended.

43. Though, out of fear, Judge initially denied she was the whistleblower, on her

7

own initiative, she corrected the denial and admitted that she communicated with the media. She also told Hamilton and Zalewski that she reported to the Michigan Attorney General's Office.

44. Hamilton and Zalewski accused Judge of being untruthful in her interview. An arbitrator later found in a stipulated order that Judge "made an inaccurate statement out of fear of retribution and termination…" and the charge of untruthfulness was not sustained.

45. As evidenced by the below allegations, Judge was right to fear retribution.

**Neil Hunter is Investigated, Reprimanded and Forced to Retire**

46. On March 14, 2024, Hunter was interviewed.

47. Hunter was not the whistleblower, and Zalewski and Hamilton knew that Hunter was not the whistleblower.

48. But they were not done with Hunter. Hamilton believed that Hunter bore responsibility for Judge's communications to the media and Michigan Attorney General's Office because he talked to Judge about the police abuse.

49. He believed that, had Hunter not done so, everything would have stayed quiet and in-house.

50. So Hamilton, with, upon information and belief, Zalewski's approval, started a second investigation. To Plaintiffs' knowledge, there were only two subjects of the second investigation. One was Hunter. The second was an officer

8

who also talked about abusive behaviors and was critical of the abusive officer.

51. On or about March 18, 2024, Hunter learned that he was the subject of the second investigation, and that the outcome could lead to discipline up to termination.

52. On or about March 20, 2024, another officer asked, upon information and belief on Hamilton's behalf, if Hunter was willing to retire.

53. Hunter declined.

54. On April 11, 2024, Hamilton issued reprimands to Hunter and the other officer under investigation.

55. In doing so, Hamilton characterized Hunter's accusations of excessive force as "slander," even though Hunter told the truth.

56. Hamilton also attempted to justify the discipline by saying that Hunter called the offending officer negative names and expressed dislike for him.

57. Setting aside the dispute whether Hunter called the abusive officer negative names, the alleged name-calling was not the true reason for the investigation and discipline.

58. The name-calling allegations are pretext because it was common for officers not to like other officers and call them negative names, without discipline.

59. Hamilton himself and his Deputy Chief called other officers negative names, often publicly, and without discipline.

9

60. Hunter also told Zalewski and Hamilton, during the investigation, about two other officers who called colleagues negative names. Zalewski and Hamilton had no interest in what these officers said. These two officers were not investigated, and they were not disciplined.

61. This was never about name-calling or about one officer not liking another.

62. The actual reason for Hunter's discipline, and what most upset Zalewski and Hamilton, were Hunter's communications with Judge, his communications with other officers, and Judge's communication to the media and the Michigan Attorney General's Office.

63. Hamilton believed that Hunter's speech was responsible for Judge's communications.

64. On April 18, 2024, Hamilton specifically stated, with regard to Hunter's reprimand, that Hunter asked other police officers their opinion whether the assaulting officer's conduct was excessive force, that Hunter spoke "a lot" to "the person responsible for contacting the news media and attorney general," and that Hunter's actions "more than likely propelled" Judge to speak to the media and Attorney General's office.

65. Notably, Hunter's reprimand was not merely a piece of paper in his file. Per the reprimand it would be a factor in regards to progressive discipline for a period of three years from the date of the offense, and it would remain in his file

10

permanently.

66. For his speech, Hunter, who Hamilton previously described as "an indispensable asset" to the agency, was investigated, disciplined, berated, disparaged, removed from use-of-force reviews, and reorganized to a lower level on the organization chart, such that he no longer reported to the Deputy Chief, but instead to another Lieutenant. It was a de facto demotion.

67. Hunter retained counsel.

68. On September 5, 2025, the City received a personnel file request notifying the City that Hunter was represented by an attorney and requesting Hunter's personnel file.

69. Upon information and belief, Hamilton was made aware of the notice and request, as he is the Chief of Police. To Hunter's observation, nothing related to the police department happened without Hamilton's knowledge.

70. On September 11, 2025, the City of Wyandotte acknowledged the notice of the attorney's representation and receipt of the request.

71. On the same day, September 11, Hamilton put Hunter on paid administrative leave and notified Hunter that he was being investigated again, on a new issue.

72. Placing Hunter on administrative leave was a retaliatory use of the investigation process motivated by Hunter's prior speech and retention of counsel.

11

73. Knowing that he had prior retaliatory discipline on his file that would influence progressive disciplinary decisions, and having heard from multiple employees that Hunter had a target on his back, Hunter could not risk a termination and loss of retirement benefits on which his family would depend.

74. So, on September 16, 2025, Hunter retired from the department, prematurely ending his 25-year career.

**Jorden Judge is Fired**

75. On April 11, 2024, Defendants terminated Judge because of her protected speech to the media and Michigan Attorney General's Office. Proffered excuses, including that she was untruthful because she initially denied being the whistleblower, were pretextual and not the actual motivation.

76. Hamilton characterized Judge's actions in talking to the Michigan Attorney General's Office and Channel 7 as "malicious and vindictive" in nature and characterized it as "a direct attack on the police administration," evidencing that Zalewski and Hamilton took Judge's communications as a personal affront.

77. As to Judge's personnel file, which could be provided to law enforcement agencies when she sought future employment, Defendants included a lengthy, damaging report documenting Judge's termination and the purported reasons for it.

12

**The City Breaches Its Agreement with Judge**

78. Judge grieved her termination.

79. On October 15, 2024, Judge and the City entered into a settlement agreement, which incorporated by reference a stipulated arbitrator's award. Per the agreement, the City was required to accept Judge's resignation. The agreement expressly required the City to modify Judge's personnel file in two ways: (1) to reflect that she resigned, and (2) to not reflect that she was terminated.

80. The agreement and incorporated arbitrator award required the City to "change" and "modify" Judge's official personnel file, meaning it had to take action to make sure her file did not reflect a termination.

81. In order to do that, the City had to remove the termination paperwork in her file.

82. The City did not do so. Instead, the City retained the original and damaging termination documentation in Judge's file.

83. The City and Hamilton willfully deprived Judge of the benefit of her bargain.

84. In addition, upon the change in her personnel status from terminated to resigned, Hamilton, as the Chief of Police, had a statutory duty under M.C.L. § 28.609(8), to notify the Michigan Commission on Law Enforcement Standards (MCOLES), the police licensing agency, of the change in Judge's separation status.

13

He did not do so.

85. As a result, Judge's MCOLES record was incomplete, showing only the termination and prior finding of untruthfulness, and nothing of her resignation and the arbitrator's finding that the untruthfulness charge was not sustained.

86. Thus, not only did the City and Hamilton not remove the original termination documentation from Judge's file, Hamilton never notified MCOLES of Judge's changed status.

87. As Defendants' substantially breached a material term of the agreement, Judge now sues for wrongful termination in violation of her First Amendment rights.

**The First Amendment Protects Plaintiffs' Speech**

88. Plaintiffs have a First Amendment right to speak to each other, the media and the Michigan Attorney General's Office about the commission of unlawful, abusive policing.

89. Abusive police practices that violate the public's constitutional rights are matters of public concern as they involve the community's political, social and legal interests.

90. Speech regarding the habitual abuse of police power to violate the public's constitutional rights is a matter of the utmost public concern for which no employer's interest in workplace harmony or effectiveness can predominate.

91. Police department policies and practices that create an environment in which police officers are able to engage in behaviors that violate the public's constitutional rights, whether through affirmative consent, tacit approval or failure to correct, are matters of public concern.

92. The limitations of the First Amendment's protections for government employees are not intended, and cannot operate, to facilitate a department's code of silence when it comes to officers speaking out about police officers abusing the public.

93. In cases involving official misconduct, as with the unconstitutional policing at issue here, the City has no employment interest more important than that of the officer's right to speak.

94. Police officers, such as Plaintiffs, are best positioned to recognize, oppose and expose these practices. They should not be punished for doing so.

**The City of Wyandotte is Liable**

95. But for Plaintiffs' protected speech, and Defendants' retaliatory animus, Plaintiffs would not have been punished.

96. Persons serving as final policymakers, including Zalewski and Hamilton, while acting under color of law, made or ratified retaliatory actions suffered by Plaintiffs.

97. Hamilton and Zalewski used the City's policies to punish Plaintiffs.

15

98. The City of Wyandotte, directly or through the Wyandotte Police Department, has a policy prohibiting officers from publicly criticizing the police department or its personnel by speech, writing, or other expression when, among other things, the department determines that doing so undermines the department's effectiveness, without regard to whether the officer spoke as a citizen and whether it involved a matter of public concern.

99. The City of Wyandotte, directly or through the Wyandotte Police Department, has a policy that prohibits officers from transmitting "rumour" or "innuendo" that it deems detrimental to the department or the employee, without regard to whether the content of the speech is protected by the First Amendment.

100. The City of Wyandotte, directly or through the Wyandotte Police Department, has a policy prohibiting officers from making any comment to the media without prior approval, without regard to whether the officer has a First Amendment right to speak to the media on matters of public concern.

101. The City of Wyandotte has a pattern and practice of punishing officers who exercise their right of speech to oppose or talk about abusive and unconstitutional policing, such that it rises to a level of a policy.

102. The City's policies operate to suppress free speech and punish people who break the code of silence.

103. The policies provide a pretextual basis for punishment when one

16

exercises their First Amendment right of speech.

104. The City's policies, together with Defendants' retaliatory animus, were the moving force in violating Plaintiffs' constitutional rights.

## COUNT I
### First Amendment Retaliation
### U.S. Const. amend. 1
(on behalf of Plaintiffs Hunter and Judge against all Defendants)

105. Plaintiffs incorporate all previously stated allegations here.

106. Hunter exercised his clearly established First Amendment right of speech when he spoke to Judge and others regarding his concerns about abusive and unconstitutional police practices that harmed the public.

107. Hunter also exercised his clearly established First Amendment right to consult and retain a lawyer to represent him.

108. Judge exercised her clearly established First Amendment right of speech when she spoke to Hunter, to the media, and the Michigan Attorney General's Office.

109. Defendants knew about Judge's and Hunter's speech.

110. Defendants took adverse actions against Hunter to punish him for his speech and deter others from similarly exercising their rights of speech, including targeting him for investigation, issuing a written reprimand, disparaging his character, removing duties, berating him and treating him differently in

17

investigatory processes.

111.   Defendants retaliated against Judge when they fired her, failed to fully update her personnel file to remove documentation reflecting her termination, and failed to report to MCOLES that Judge resigned and that the charge was not sustained.

112.   But for Hunter's and Judge's speech, and Defendants' retaliatory animus, they would not have been subjected to these adverse actions.

113.   Defendants' actions were taken to chill free speech and were an example to deter other officers from speaking up about abusive policing.

114.   As a result, Hunter and Judge suffered damages, including lost employment and job opportunities, wages, anguish, stress, humiliation, and disparagement.

## COUNT II
### Breach of Contract
### (Plaintiff Judge against Defendant City of Wyandotte)

115.   Plaintiffs incorporate all previously stated allegations.

116.   Judge entered into a contract with the City on October 15, 2024.

117.   The agreement and incorporated arbitrator award required the City to "change" and "modify" Judge's official personnel file to make sure her file did not reflect a termination, which required removal of the termination documentation in her file.

18

118. The City did not modify the file to remove the documentation reflecting her termination.

119. The City breached the agreement.

120. The breach was material and substantial as revision of the personnel file was a principal benefit for which Judge agreed to release her claims, and she did not receive the benefit of the bargain.

121. Judge, therefore, is relieved of her obligation to perform under the agreement, she is no longer bound by the release, and she is able to sue Defendants for her retaliatory termination.

## COUNT III
### Negligence
### (Plaintiff Judge against Defendant Archie Hamilton)

122. Plaintiffs incorporate all previously stated allegations.

123. Hamilton owed Judge a legal duty to comply with M.C.L. § 28.609(8) and report to MCOLES all personnel transactions affecting employment status.

124. Hamilton breached that duty when he failed to report to MCOLES that Judge's separation status was resigned and not terminated, a transaction that affected her employment status.

125. In failing to do so, Hamilton engaged in conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted, raising his action to the level of gross negligence.

19

126. As a result of Defendant's conduct, Judge lost one or more employment opportunities because her MCOLES record did not fully reflect the nature of her separation.

127. Any objective observer could reasonably conclude that Hamilton simply did not care about the injury that would arise from his failure to notify MCOLES of the changed employment status.

128. Defendant Hamilton's conduct was the proximate cause of Judge's damages, which were a foreseeable consequence of Hamilton's conduct.

## RELIEF REQUESTED

For these actions and the harms done, Plaintiffs seek:

    a.  lost wages

    b.  compensatory damages

    c.  punitive damages

    d.  attorney fees and costs

    e.  All other equitable and legal remedies the Court determines are appropriate.

/s/ Nakisha N. Chaney\
**Nakisha N. Chaney (P65066)**\
Salvatore Prescott Porter & Porter\
Attorneys for Plaintiffs\
105 E. Main Street\
Northville, MI 48167\
248.679.8711\
chaney@sppplaw.com

Dated: April 15, 2026

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**NEIL HUNTER** and **JORDEN JUDGE**, individuals,

    Plaintiffs,

v.

**CITY OF WYANDOTTE**, a municipality, **BRIAN ZALEWSKI**, in his individual capacity, and **ARCHIE HAMILTON**, in his individual and official capacities,

    Defendants.

**Case No**. **2:26-cv-11227**
**Hon**.
**Mag**.

**DEMAND FOR JURY TRIAL**

_____

Nakisha N. Chaney (P65066)
Salvatore Prescott Porter & Porter PLLC
Attorneys for Plaintiffs
105 E. Main Street
Northville, MI 48167
248.679.8711
chaney@sppplaw.com

_____/

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial in the above-captioned matter.

2

/s/Nakisha N. Chaney_____
**Nakisha N. Chaney (P65066)**
Salvatore Prescott Porter & Porter
Attorneys for Plaintiffs
105 E. Main Street
Northville, MI 48167
248.679.8711
chaney@sppplaw.com

Dated: April 15, 2026

2